MICHAEL O. EGGER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Egger v. Commissioner
Docket No. 4458-86.
United States Tax Court
T.C. Memo 1987-478; 1987 Tax Ct. Memo LEXIS 474; 54 T.C.M. (CCH) 613; T.C.M. (RIA) 87478; September 21, 1987. Michael O. Egger, pro se. Alan C. Levine, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: For the calendar year 1981, respondent determined a deficiency in petitioner's income tax in the amount of $ 7,855. The issues which we must determine are whether petitioner is entitled to the earned income exclusion and housing exclusion for 1981 under sections 911 and 119, respectively, [1] and, if he is, whether he is also entitled to a deduction for foreign living expenses in that year under section 913. [2]
*476 FINDINGS OF FACT Some of the facts herein were stipulated, and such stipulation, together with attached stipulated exhibits, is incorporated herein by this reference. At the time of filing his petition herein, petitioner was a resident of Hyattsville, Md. His income tax return for 1981 was filed on the basis of a single taxpayer. Throughout the year 1981, petitioner was employed by the Northrup Corporation, and resided in Saudi Arabia. He lived in a housing compound operated by Northrup for its employees known as "Al Khodary," which is located approximately 10 kilometers from the nearest city of Khobar. Petitioner worked at the King Abdul Aziz Air Base, which is approximately six kilometers or four miles from the housing compound. Most Northrup employees employed at the King Abdul Aziz Air Base lived in this compound. Although it would have been possible for a Northrup employee to find his own housing in the City of Khobar, it would have been extremely difficult and very expensive, and would have required Saudi Arabian Government permission. The Al Khodary compound (hereinafter "AK" or "the compound") is a 152-unit residential facility which is walled and covers a space *477 of approximately 300 by 400 meters. The compound is divided into 60 single-bedroom apartments, 48 two-bedroom apartments, 36 three-bedroom apartments, and eight townhouses. It was built by the Northrup Corporation for the senior management level of Northrup employees. The buildings were of modern design, and were constructed of precast concrete slabs, four inches thick, fitted together and hung in groove fashion. Most of the buildings were three stories high. As a single man, petitioner occupied a one-bedroom apartment, with an area of 1,000 square feet. The apartment was completely air conditioned with its own unit, having a capacity of 2,000 square feet. Petitioner's apartment, in common with all the other residential units at the compound, was completely furnished and equipped with the most modern equipment, including copper piping, hot water heaters, refrigerators, stoves and kitchen equipment. Residents, such as petitioner, had the option of preparing their own meals at home, or of eating in the common dining facility maintained by Northrup for all residents of the compound. Such common dining facility was normally operated on the cafeteria style, but, from time to time, *478 special events would be held involving "theme" dinners, such as Italian, Greek or American-style cooking, and during these special events, meals would be served at one's table. In addition to the facilities furnished to residents of the compound in their own apartments and in the common dining facility, the AK compound had the following amenities: a community center, beauty shop, barber shop, game room, and a community room for holding community meetings. The compound also had a swimming pool (one-half olympic size), a wading pool for children, a weight room, a movie room with a large screen, and a teen center with a recreation room for teenagers. There was also a car wash facility. The compound had four tennis courts and handball courts. There was a bowling alley with four lanes. The swimming pool had eight swimming lanes, and regional swim meets were held at the compound. Full electrical service was provided by the compound to its residents, and backup generators were present, in the event of the occasional power outage. The AK compound had its own water treatment plan which, using an electrodialysis process, produced 100,000 gallons per day of portable water. The AK *479 compound was unique in that it was the only residential compound provided by Northrup which provided potable water to its residents. The water distributed at the AK compound was within United States Public Health Service standards for potable water. In addition to its own water treatment plant, the AK compound had its own sewage treatment plant. The sewage ran in closed pipes, which were designed according to American standards, to a sewage treatment plant where the effluent was treated through an aeration process, and clarified effluent then ran to a holding tank where it was treated with chlorine. When the holding tank became full, the clarified effluent was distributed to the irrigation system on the grounds. Upon occasion, when the sewage treatment plant was overloaded, there would be a spillage of untreated sewage which was routed outside of the compound into an open ditch or arroyo in the desert. After discharge into this ditch, the sewage effluent would be treated with the direct application of raw chlorine or sodium hypochlorite or calcium hypochlorite, the same type of disinfectant used in swimming pools. The facilities of the AK compound were maintained by Northrup *480 with a supervisor and a working staff of 23 people. Service personnel were on call 24 hours a day, for such emergencies as water failure, power failure, or other urgent need. Air conditioning failure was considered an emergency in Saudi Arabia, because of the high prevailing temperatures, and the Northrup maintenance team was required to respond within 24 hours. On the average, the maintenance team responded to a call within two or three hours. Although there were five or six power outages at the AK compound in 1981, no power outage lasted more than two hours. All roads within the AK compound were paved, and the compound itself was landscaped, planted with grass, Australian pine and oleander. The compound was not located in a malarial area of Saudi Arabia, but there was periodic fogging by the maintenance crew against insects. Although from time to time there was air pollution or "smog" at the AK compound, the level of such air pollution did not exceed that which prevails in certain atmospheric conditions in major United States cities. Street lighting was provided within the compound, with lights being placed every 25 meters. In his return for 1981, petitioner claimed *481 an exclusion of $ 20,000 from his taxable income under the provisions of section 911, relating to income earned by taxpayers residing in a camp located in a hardship area. Petitioner also claimed a housing exclusion of $ 6,769, under the provisions of section 119. Upon audit, respondent disallowed petitioner's claimed exclusions under sections 911 and 119, but determined that petitioner was entitled to a deduction of $ 9,500 for excess foreign living expenses under section 913 (not claimed by petitioner in his return). OPINION The primary issue between the parties is whether petitioner for the year 1981 was entitled to the special exclusions from income provided by sections 911 and 119 in the case of persons residing overseas in a camp located in a hardship area. Petitioner contends that he was; respondent determined otherwise. [3]
*482 Section 911, as in effect in 1981, provides that "in the case of an individual described in section 913(a) who, because of his employment, resides in a camp located in a hardship area," certain items should not be included in his gross income but shall be exempt from taxation. Thus, section 911(a)(1) provides that there shall be excluded from gross income earned income attributable to services performed during the period of an individual's bona fide residence. Section 911(a)(1) provides further that the amount excluded is to be determined by the special rules contained in section 911(c). [4] Such special rules, inter alia, set forth specific requirements which must be met before the employee is "considered to reside in a camp." If such tests are met, however, the employee will qualify for the benefits of section 911 and, in addition, the camp will be considered to be part of the business premises of the employer for purposes of section 119. Sec. 911(c)(7). *483 As to what constitutes a "camp," the requirements of section 911 are numerous. First, the camp must be located in a hardship area. Secs. 911(a), (c)(1)(C). In addition, section 911(c)(1)(B) spells out the other requirements as follows: (B) Camp. -- For purposes of this section, an individual shall not be considered to reside in a camp because of his employment unless the camp constitutes substandard lodging which is -- (i) provided by or on behalf of the employer for the convenience of the employer because the place at which such individual renders services is in a remote area where satisfactory housing is not available on the open market, (ii) located, as near as practicable, in the vicinity of the place at which such individual renders services, and (iii) furnished in a common area (or enclave) which is not available to the public and which normally accommodates 10 or more employees. In this case, the area of disagreement is narrow. Respondent concede: (1) That the AK compound is located in a hardship area; (2) That the lodging in the AK compound was provided by or on behalf of Northrup for the convenience of Northrup because the place in which petitioner rendered *484 his services is in a remote area where satisfactory housing is not available on the open market; (3) That the AK compound is located as near as practicable to the place in which petitioner rendered his services (the King Abdul Aziz Air Base); and (4) That petitioner's lodging at the AK compound was furnished in a common area not available to the public and which normally accommodates 10 or more employees. Thus, the only controversy between the parties is as to whether the housing furnished to petitioner at the AK compound was "substandard" within the meaning of section 911(c)(1)(B). As to this, petitioner's only specific complains are (a) that on occasions, untreated sewage was released within the compound and (b) that sometimes his apartment was too hot. We think that petitioner must fail on both these points. In general, as our findings of fact have indicated, it appears that the AK compound was built, furnished and operated by the Northrup Corporation to afford a high degree of comfort to employees employed at the Abdul Aziz Air Base. Competent, detailed and thoroughly credible testimony was offered by the official of Northrup in charge of maintenance and facilities *485 at the AK compound with respect to the occasional overflow of sewage. As we have found, the overflows happened only sporadically. When they occurred, sewage was routed outside the compound to a ditch or arroyo in the adjacent desert where it was dumped and was thereafter treated chemically to combat pollution and contamination. We find the situation here to be no different in degree from the rural dweller in the United States, living outside an urban sewage system, whose septic tank will occasionally overflow. As to the second point, the testimony presented was that petitioner's apartment had an air conditioning unit with twice the rate capacity of the space in petitioner's apartment which such equipment was intended to cool. If, from time to time, the cooling was inadequate, the testimony here was that it was only temporary, resulting either from a temporary power outage or the failure of the tenant to clean the filters in his air conditioner. Petitioner had the burden of proving that the housing he was provided at the AK compound was substandard within the meaning of section 911 and section 1.911-1(c)(2), Income Tax Regs.; Welch v. Helvering,290 U.S. 111, 115 (1933); *486 Rule 142(a). We hold that he has failed to carry that burden of proof. We thus hold that he is not entitled to the special exclusion from income provided by section 911. As the result of the above holding, it further follows that petitioner is not entitled to the income exclusion provided by section 119. That section provides in relevant part that the value of any meals or lodging furnished to the taxpayer by or on behalf of his employer for the convenience of the employer shall be excluded from the taxpayer's income, but only if, inter alia, such lodging is located on the business premises of the employer. Sec. 119(a)(2). Under the ordinary test of section 119, the AK compound would not be considered to be on the business premises of the employer, since it was located approximately four miles from the King Abdul Aziz Air Base, where petitioner performed his services. Dole v. Commissioner,43 T.C. 697, 706-707 (1965), affd. per curiam 351 F.2d 308 (1st Cir. 1965); Commissioner v. Anderson,371 F.2d 59, 67 (6th Cir. 1966), revg. 42 T.C. 410 (1964), cert. denied 387 U.S. 906 (1967); [5] see also Johnson v. Commissioner,T.C. Memo. 1983-479; *487 Crowe v. Commissioner,T.C. Memo. 1980-178. If petitioner had prevailed in his position under section 911, the AK compound would have been considered to be on the business premises of his employer, pursuant to he specific provisions of section 911(c)(7). Having failed the section 911 test, however, the ordinary standard of section 119 applies, and we hold that the AK compound was not located on the business premises of the employer so as to entitle petitioner to the exclusion provided by section 119. Having held in favor of respondent with respect to both the section 911 issue and the section 119 issue, we need not discuss respondent's allowance to petitioner of the exclusion from income provided by section 913. Decision will be entered for respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. In his pleadings, as well as at trial, petitioner sought to raise another issue regarding the propriety of respondent's actions in selecting and auditing petitioner's income tax return for the year in issue. Petitioner alleges that such action was taken by respondent in revenge for petitioner's having resisted clandestine efforts by various government persons, including the CIA, to involve petitioner in a covert and illegal conspiracy to engage in unlawful activities overseas, during the time he was a resident of and working in Saudi Arabia. At trial, and in the interests of savings trial time, petitioner was permitted to introduce into evidence copies of correspondence which he had had with individual members of Congress, as well as lengthy letters he had written to the Congress regarding the history and background of this alleged conspiracy and illegal action on the part of the government. Such documents were admitted solely for the purpose of summarizing what petitioner's testimony would have been if given on the stand, reserving full rights of cross-examination to respondent. Petitioner's allegations were totally unsupported by evidence from any other source. An examination of these allegations satisfies us that they are inherently incredible, and are the result of emotional and psychological problems under which petitioner (by his own admission in open court) is suffering. We accordingly make no further reference to these matters herein except to express the hope that petitioner, perhaps with assistance, can overcome the emotional and psychological problems which presently beset him. ↩
3. In his statutory notice, respondent determined that petitioner was entitled to special deductions under section 912 for excess foreign living expenses. Such allowance was linked to respondent's determination that petitioner was not entitled to the benefits of sections 911 and 119. If the Court should rule in favor of petitioner with respect to the sections 911 and 119 issues, then respondent contends that the benefits granted to petitioner with respect to section 913 deductions would not be allowable. See sec. 913(d)(2)(E)↩. 4. There is no dispute between the parties as to the dollar amounts of respondent's determinations under each of sections 911, 119 and 913↩. The only dispute is as to petitioner's qualification for the benefits of those actions under the facts in this case. 5. Although this Court was reversed by the Sixth Circuit in Commissioner v. Anderson, the opinion of the Court of Appeals has since been cited by us, see Benninghoff v. Commissioner,71 T.C. 216, 220 (1978), affd. per curiam 614 F.2d 398 (5th Cir. 1980), and Lindeman v. Commissioner,60 T.C. 609, 613-617↩ (1973).